1  DENNIS S. ELLIS (SB# 178196)
   dennisellis@paulhastings.com
2  KATHERINE F. MURRAY (SB# 211987)
   katherinemurray@paulhastings.com
3  SEAN D. UNGER (SB# 231694)
   seanunger@paulhastings.com
4  PAUL HASTINGS LLP
   515 South Flower Street
5  Twenty-Fifth Floor
   Los Angeles, CA 90071-2228
6  Telephone:  (213) 683-6000
   Facsimile:  (213) 627-0705
7
   Attorneys for Plaintiff
8  L'OREAL USA, INC.

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12 | L'OREAL USA, INC., a Delaware | CASE NO. 2:16-CV-03572
   | corporation,
13 |                              | **COMPLAINT FOR:**
   |              Plaintiff,
14 |                              | **(1) BREACH OF WRITTEN**
   |      vs.                     |     **LOGISTICS AGREEMENT;**
15 |                              | **(2) BREACH OF SALE OF GOODS**
   | SPATZ LABORATORIES, a        |     **CONTRACTS;**
16 | California corporation,       | **(3) VIOLATION OF CAL. BUS. &**
   |                              |     **PROF. CODE §§ 17200 ET SEQ.;**
17 |              Defendant.      | **(4) FRAUD — FALSE PROMISE;**
18 |                              | **(5) FRAUD — AFFIRMATIVE**
   |                              |     **MISREPRESENTATION;**
19 |                              | **(6) FRAUD — NEGLIGENT**
20 |                              |     **MISREPRESENTATION;**
   |                              | **(7) BREACH OF WRITTEN FULL BUY**
21 |                              |     **MASTER AGREEMENT FOR**
   |                              |     **SUBCONTRACTING**
22 |                              |     **MANUFACTURING (AS THIRD-**
   |                              |     **PARTY BENEFICIARY THEREOF);**
23 |
24 |                              | **(8) INFRINGEMENT OF U.S. PATENT**
   |                              |     **NO. 8,025,869;**
25 |                              | **(9) SPECIFIC PERFORMANCE AND**
   |                              |     **INJUNCTIVE RELIEF; AND**
26 |                              | **(10) DECLARATORY RELIEF**
27 |
   |                              | **JURY TRIAL DEMANDED**
28

Plaintiff L'Oréal USA, Inc. ("Plaintiff" or "L'Oréal USA"), by and through its attorneys Paul Hastings LLP, herein alleges as follows:

## NATURE OF THE CASE

1.    This action arises out of Defendant Spatz Laboratories' ("Spatz") attempt to exploit its long-standing relationship with L'Oréal USA to cripple Plaintiff and stifle competition in the cosmetics market.

2.    L'Oréal USA develops and manufactures hair care, skincare, cosmetics and fragrances for the consumer, luxury and professional markets and distributes those products through nearly 30 brands.  L'Oréal USA is a wholly-owned subsidiary of L'Oréal S.A. ("L'Oréal S.A."), the world's leading beauty company, which is headquartered in Paris, France.  For over a century, L'Oréal S.A. and its subsidiaries have delivered products that are innovative, highly effective and manufactured to the most demanding standards of quality and safety. L'Oréal S.A. accomplishes these goals through strong and lasting relationships with its customers and its suppliers, founded on trust and mutual benefit.

3.    Based in Oxnard, California, Defendant Spatz is one of L'Oréal USA's manufacturing suppliers.  Since 2009, Spatz has been manufacturing products for L'Oréal USA on a 12-month rolling basis.  Spatz has manufactured over 200 Stock Keeping Units ("SKU") for L'Oréal USA across nearly twenty product lines and at least three L'Oréal USA brands, including Maybelline, L'Oréal Paris and Lancôme.

4.    L'Oréal USA has provided years of unique technical and industry insight to Spatz, has promoted Spatz across its numerous brands, and has given Spatz tens of millions of dollars in business.  In the year 2015 alone, L'Oréal USA paid more than $20 million to Spatz.

5.    In February 2016, Spatz appointed a new CEO and announced to L'Oréal USA that it would be implementing a new, dual path strategy, whereby Spatz would continue to manufacture products for its commercial clients, but would

1

1   also develop products for its own brand under the brand incubator "Seed Beauty,"

2   which would be led by John and Laura Nelson, whose father, Joseph Nelson,

3   purchased Spatz in 1989.  Spatz's new CEO, Mary Beth Siddons, would continue to

4   lead Spatz's contract-manufacturing business.

5          6.     Despite Spatz's representations and assurances that it would

6   continue to supply products to L'Oréal USA, within a month of making those

7   representations, and without prior notice to L'Oréal USA, Spatz abruptly changed

8   course, informing L'Oréal USA in March 2016 that it would cease manufacturing

9   any products for L'Oréal USA as of June 30, 2016.

10         7.     Spatz made this announcement after acknowledging that: (1)

11   L'Oréal USA would need about a year to find a new supplier for at least two of its

12   product lines for 2017; (2) L'Oréal USA would face a serious out-of-stock situation

13   if Spatz abandoned L'Oréal USA on such short notice; and (3) unbeknownst to

14   L'Oréal USA, Spatz had been evaluating its business with L'Oréal USA, and

15   whether it would continue, since at least January 2016, well before Spatz had

16   assured L'Oréal USA that it would continue supplying its products.

17         8.     Thus, Spatz deliberately lured L'Oréal USA into believing that

18   Spatz would continue to make all of the contracted products for L'Oréal USA

19   through 2017, while secretly planning to abandon L'Oréal USA in a manner that

20   would cause the most harm to L'Oréal USA.

21         9.     Not only will Spatz's impending actions damage L'Oréal USA

22   financially, but they will also cause L'Oréal USA irreparable injury.  Without

23   supply, L'Oréal USA will lose valuable shelf space at key retailers, which, in turn,

24   will cause a loss to L'Oréal USA's reputation and goodwill.  The production cycle

25   for cosmetics is not an overnight event.  Important ingredients must be acquired;

26   processes must be perfected; health and safety standards have to be checked and

27   double-checked.  For cosmetics companies like L'Oréal USA who care and invest

28   deeply in their customers, the transition from one supplier to another is not a short

1   one.  Quality must be assured and the high standards that L'Oréal USA – and its

2   customers – demand must be met.  Three months is simply not enough time for

3   L'Oréal USA to transition the many lines Spatz seeks to abandon, a fact Spatz itself

4   has admitted.

5          10.   Despite Spatz's admission that it would take nearly a year for

6   L'Oréal USA to transition just two of the many product lines Spatz manufactures

7   for L'Oréal USA, Spatz now wants to abandon **all** of the nearly 20 product lines it

8   manufactures for L'Oréal USA and with only three-months' notice.  Spatz's

9   wrongful actions will lead directly to loss of valuable shelf-space in a highly

10  competitive retail market, resulting in L'Oréal USA's loss of consumer confidence,

11  goodwill and reputation.

12         11.   L'Oréal USA's products are unique.  They bear the names of

13  L'Oréal USA's brands, and L'Oréal USA's millions of customers trust these brands

14  to deliver the quality and efficacy they have come to expect.  L'Oréal USA's

15  customers also assume that when they go to the store they will find their L'Oréal

16  USA products on the shelf.  Spatz seeks to disrupt that.  While L'Oréal USA is an

17  institution in the cosmetics industry, the industry is incredibly competitive.  If

18  L'Oréal USA does not have sufficient supply to fill store shelves, that shelf-space is

19  given to a competitor and it is very difficult to regain that lost shelf-space.  When a

20  customer goes to the store and finds L'Oréal USA's products missing or out-of-

21  stock, that results in a lost sale, which certainly causes financial injury to L'Oréal

22  USA.  But it also disrupts the customer's ability to rely on continuous access to

23  L'Oréal USA's products; the customer is no longer able to trust L'Oréal USA to

24  supply a steady stream of the products the customer seeks, and may shift her

25  loyalties to another brand—an immeasurable and irreparable injury to L'Oréal

26  USA.

27

28

1       12.    Spatz's intentions here are clear and improper:  eliminate

2    L'Oréal USA as a competitor to Spatz's product lines so that Spatz can have a clear

3    path to dominate the market with its own branded products.

4       13.    Adding insult to injury, Spatz also intends to use, without

5    authorization, L'Oréal USA's intellectual property to manufacture competing

6    products.  L'Oréal S.A. is the owner, and L'Oréal USA is the exclusive licensee

7    with the right, *inter alia*, to bring suit and recover damages for past, present and

8    future damages of United States Patent No. 8,025,869 ("the '869 patent").  The

9    '869 patent entitled "Cosmetic Composition Having Enhanced Wear Properties"

10    issued on September 27, 2011.  The '869 patent relates generally to a cosmetic

11    composition for keratinous materials comprising a silicone resin in a cosmetically

12    acceptable medium and to a makeup or care process for the keratinous materials.

13       14.    At least two products manufactured and sold by Spatz in the

14    United States and within this judicial district infringe the '869 patent.  On

15    information and belief, Spatz's business activities involve the manufacture, use,

16    offer for sale, and sale of cosmetics having enhanced wear properties including but

17    not limited to the Kylie Matte Liquid Lipstick and ColourPop Ultra Matte products.

18    In a letter dated May 17, 2016, from Dennis S. Ellis, counsel for L'Oréal USA to

19    Stephen D. Poss, counsel for Spatz, L'Oréal USA placed Spatz on notice that its

20    Kylie Matte Liquid Lipstick and ColourPop Ultra Matte products infringe the '869

21    patent.

22       15.    L'Oréal USA brings this action to recover the damages it has

23    suffered, and will suffer, as a result of Spatz's refusal to supply L'Oréal USA with

24    products pursuant to the agreements and course of dealing between the parties and

25    for its willful infringement of the '869 patent.  L'Oréal USA also seeks specific

26    performance of the terms, conditions, and provisions of the agreements between the

27    parties by court decree, among other things, ordering Spatz to continue to supply

28    products to L'Oréal USA through March 31, 2017.  In addition, L'Oréal USA seeks

an injunction prohibiting Spatz from making, using, selling or offering for sale any products that infringe the '869 patent.  L'Oréal USA also seeks a declaration that Spatz's intent to terminate its relationship with L'Oréal USA on three months' notice is improper, and that Spatz's infringement of the '869 patent has been willful and deliberate.

## PARTIES

16.     Plaintiff L'Oréal USA, Inc. is a corporation duly organized under the laws of Delaware, with its corporate offices at 575 Fifth Avenue, New York, New York 10017.

17.     Defendant Spatz Laboratories is a corporation duly organized under the laws of California, with its corporate office and principal place of business at 1600 Westar Drive, Oxnard, California, 93033.

## JURISDICTION AND VENUE

18.     This Court has original diversity jurisdiction under 28 U.S.C. § 1332(a) as the parties are diverse and the amount in controversy exceeds $75,000.

19.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a).

20.     Venue is appropriate in the United States District Court for the Central District of California pursuant to 28 U.S.C. Section 1391(b) because Spatz conducts business in this District and a substantial part of the acts, events and/or omissions on which the claims are based occurred in this District, and under 28 U.S.C. Section 1400(b) because Spatz has committed acts of infringement of the '869 patent in this District.

21.     This Court has personal jurisdiction over Defendant because Spatz is a California corporation, with its principal place of business in California.

## FACTUAL ALLEGATIONS

### The Parties' Relationship

22.     Spatz claims it was founded in 1955 by engineer Walter Spatz, and was purchased by Joseph Nelson, in 1989.  Spatz appears to be a privately-held company run by Joseph Nelson's children, John Nelson and Laura Nelson.

23.     L'Oréal USA is informed and believes, and on that basis alleges, that in 2000, Spatz began investing in final pack-out equipment so that it could offer complete turnkey products to its clients, including L'Oréal USA.  By 2005, 95% of the products that Spatz shipped to trade were complete turnkey products, from product formula to packaging.

24.     In 2009, Spatz began supplying products to L'Oréal USA.  The volume of products Spatz manufactures for L'Oréal USA is substantial.  In 2015 alone, Spatz supplied L'Oréal USA with approximately 28 million units, with 257 unique SKUs, primarily for the U.S. market.  The majority of these units were for Maybelline, including well-known product lines such as Unstoppable, Define A Line, and Color Blur.

25.     Spatz has benefitted greatly from its long-standing relationship with L'Oréal USA.  Throughout the years, L'Oréal USA has provided Spatz with unique technical and industry insight, as well as substantial revenue, which Spatz has used to develop into the large supplier it is today.  Due in part to its relationship with L'Oréal USA, Spatz contends its roster of commercial clients now includes L'Oréal USA competitors such as Estee Lauder, Revlon and Mary Kay.  Spatz is also believed to be the supplier behind the Kylie Lip Kits product line from Kylie Cosmetics, a cosmetics line launched in 2015 by reality television personality Kylie Jenner.  In addition, Spatz has begun to develop, market and produce its own in-house brands, including ColourPop, Colour Style, Jupe and Fluid Beauty.

1

**The Parties' Contractual Agreements**

2

     26.    L'Oréal USA's relationship with Spatz is governed by a Full

3

Buy Master Agreement for Subcontracting Manufacturing (the "Master

4

Agreement"), the most recent version of which was entered into by Spatz and

5

L'Oréal S.A. on November 15, 2013 and July 1, 2014, respectively.

6

     27.    Under the Master Agreement, Spatz agreed to manufacture and

7

furnish products to L'Oréal S.A. and its subsidiaries, which are defined in the

8

Master Agreement as "Customer Subsidiaries."  L'Oréal USA is one such

9

Customer Subsidiary, and Spatz has supplied products to L'Oréal USA pursuant to

10

the Master Agreement over the course of several years.  L'Oréal USA is thus a

11

third-party beneficiary under the Master Agreement.

12

     28.    Spatz's relationship with L'Oréal USA is also supplemented by

13

the parties' Logistics Agreement and their course of dealing pursuant to the

14

Logistics Agreement over several years.  The Logistics Agreement provides the

15

logistics and parameters of supply and production planning necessary for Spatz and

16

L'Oréal USA to carry out the Master Agreement.  The Logistics Agreement was

17

signed by Spatz on August 16, 2013, and by L'Oréal USA on September 10, 2013.

18

A true and correct copy of the Logistics Agreement is attached hereto as Exhibit

19

"A."

20

**The Parties' Supply Chain Process**

21

     29.    The Logistics Agreement defines the logistics and parameters of

22

supply and production planning.  Pursuant to the Logistics Agreement, L'Oréal

23

USA provides Spatz with a production plan on a monthly basis that reflects a

24

"rolling 12-month horizon" for production.  This production plan (also referred to

25

in the Logistics Agreement as the "finished good plan," the "finished good

26

production plan," or simply, "the plan") dictates the quantity that Spatz would need

27

to deliver to L'Oréal USA each month.  In this production plan, each product is

28

1  broken out by the number of SKUs that L'Oréal USA expects Spatz to provide over

2  the next twelve (12) months.

3         30.    Under the Logistics Agreement, the parties discuss and

4  ultimately reach agreement on the quantity to be validated in the production plan

5  during a period of time referred to as the "preliminary plan phase."  This phase lasts

6  from the twenty-fifth business day of the previous month to the eighth working day

7  of the current month, and culminates in the monthly production plan.  At the end of

8  the preliminary plan phase, L'Oréal USA submits the production plan for the

9  month, and Spatz responds and validates the production plan within twenty-four

10  hours if Spatz has no proposed changes, or within forty-eight hours if Spatz has

11  changes to propose.

12         31.    If L'Oréal USA does not provide Spatz with a production plan

13  by the tenth working day of the month, there is always a contingency production

14  plan in place:  Spatz is to use the prior month's production plan, and execute its

15  production obligations for the current month under the prior month's plan.

16         32.    Once the preliminary plan is validated, Spatz manufactures the

17  products and delivers the agreed-upon quantities in accordance with the "planned

18  horizon" timeline.  The planned horizon for each product is defined in the Logistics

19  Specification attached to the Logistics Agreement, and was initialed by the parties

20  as part of the agreement on September 10, 2013.

21         33.    L'Oréal USA and Spatz have followed this production plan

22  process for several years without incident.

23         **The Parties' Discussions Prior to Spatz's Attempted Termination**

24         34.    On February 1, 2016, Spatz owners John and Laura Nelson met

25  with representatives of L'Oréal USA in New Jersey.  During that meeting, the

26  Nelsons expressed their continued desire to partner with L'Oréal USA, and Spatz

27  presented product innovations for which L'Oréal USA could have exclusivity.  The

28

1  parties collaborated on an action plan, which included a commitment to a continued

2  long-term relationship.

3          35.    On March 4, 2016, Simon Vieville, L'Oréal USA's Assistant

4  Vice-President of Contract Manufacturing and Severine Thery-Cave, L'Oréal

5  USA's Vice President of Purchasing Americas, held a conference call with Spatz's

6  Chairman, John Nelson, which was summarized in a March 6, 2016 email sent by

7  Spatz.

8          36.    In the March 6, 2016 email, Spatz summarized the parties'

9  discussion of two key Maybelline product lines, Define A Line and Unstoppable.

10  Spatz indicated that it did not see an ability to reduce or offset price increases for

11  these product lines, and therefore, "in the spirit of partnership and the desire to be

12  as transparent as possible, Spatz agrees with L'Oréal [USA]'s decision to move this

13  business in 2017, so that L'Oréal [USA] can plan accordingly."  Spatz also noted in

14  its email that "[d]uring the call it was made very clear that L'Oréal [USA] does not

15  in fact currently have another source for these two products, and the hope is that

16  SPATZ could maintain the current level of capacity on these products."  Following

17  discussions with Spatz's senior management, Spatz concluded that "it is in L'Oréal

18  [USA]'s best interest to accelerate the transfer of these two products by the end of

19  2016."  Spatz acknowledged that L'Oréal USA would need at least eleven months

20  to transition these product lines to a new supplier:  "With 11 months available,

21  SPATZ believes it is important for it formally announce this to L'Oréal [USA] so

22  L'Oréal [USA] can move as quickly as possible and avoid an out of stock

23  situation."

24          37.    On March 9, 2016, representatives from L'Oréal USA met with

25  Spatz for a business alignment meeting, held at Spatz's facility in Oxnard.  Later

26  that day, L'Oréal USA sent an email to Spatz summarizing the March 9, 2016,

27  meeting.  In the email, L'Oréal USA indicated that it would provide Spatz with

28  information relating to demand, upside potential, and units planned below target

stock through the remainder of 2016 by mid-March 2016, and that Spatz would confirm how much capacity could be allocated to L'Oréal USA through the remainder of 2016 by March 28, 2016.  L'Oréal USA's email also noted that the parties had discussed the possibility of transferring the Maybelline Define A Line and Unstoppable product lines, as well as a third product line, L'Oréal Paris' Pop Matic, to a new supplier, but noted that "no final decision will be made without agreement from both parties."  L'Oréal USA's email added that Spatz would confirm its position on whether it would be willing to disclose and transfer the existing formulas for these product lines to L'Oréal USA by March 28, 2016.

38.	L'Oréal USA's March 9, 2016 email indicated that the parties would plan their next regroup on various topics for the week of March 28, 2016, and would schedule an in-person meeting between April 11 and April 13, 2016.

39.	On March 11, 2016, Spatz responded to L'Oréal USA's March 9, 2016, email.  Spatz noted that "based on current market conditions, there is almost a certainty that there will be a delta between available capacity at SPATZ for L'Oréal [USA] compared to the Demand from L'Oréal [USA].  The information provided by L'Oréal [USA] to SPATZ by 3/18 along with the information provided by SPATZ on 3/28 will help enable SPATZ and L'Oréal [USA] to work together to prioritize which products to produce."  With respect to the specific product lines discussed at the March 9, 2016 meeting, Spatz stated that it "maintains its position that L'Oréal [USA] accelerate the transfer of Define a Line and Unstoppable products.  SPATZ wants to partner with L'Oréal [USA] for a smooth transition of these products and is aiming to provide position regarding formula disclosure prior to 3/28."

40.	On March 15, 2016, L'Oréal USA held a follow-up telephone call with Spatz to discuss Spatz's suggestion that L'Oréal USA transfer the Maybelline Define A Line and Unstoppable product lines to another supplier in 2017.  L'Oréal USA inquired whether Spatz would be willing to transfer the

1   intellectual property relating to those products to L'Oréal USA to facilitate the

2   transfer to another supplier.  Spatz agreed to provide an update to L'Oréal USA by

3   the end of the month.

4          41.    At this point in the parties' dealings, Spatz gave L'Oréal USA

5   no indication—during the March 4, 2016 conference call, in Spatz's March 6, 2016

6   email summarizing the call, during the parties' March 9, 2016 business alignment

7   meeting, in Spatz's email dated March 11, 2016 or during the March 15, 2016

8   call—that Spatz intended to cut off L'Oréal USA's supply to either the Define A

9   Line and Unstoppable product lines before 2017, or to any other product lines at

10  any time.

11          **Spatz Abruptly Announces It Will Cut Off All Supply In Three Months.**

12          42.    On March 29, 2016, Spatz CEO Mary Beth Siddons revealed to

13  L'Oréal USA that in late January 2016, Spatz had begun an assessment of capacity

14  utilization versus margin contribution for each client and product, including

15  L'Oréal USA products.

16          43.    Ms. Siddons then informed L'Oréal USA that the next day,

17  March 30, 2016, Spatz would be giving L'Oréal USA notice of its intent to

18  terminate its relationship.  L'Oréal USA responded with a request for an in-person

19  meeting with Spatz owners John and Laura Nelson.

20          44.    On March 30, 2016, Spatz sent L'Oréal USA a letter informing

21  it that Spatz would only supply product to L'Oréal USA through June 30, 2016.

22          45.    On May 10, 2016, Frederic Rozé, President and CEO of L'Oréal

23  USA, met with Spatz Chairman John Nelson, in an effort to resolve the issues

24  created by Spatz's attempt to terminate its relationship with L'Oréal USA on such

25  short notice.  The parties engaged in subsequent discussions on May 16, 2016.

26          46.    On May 17, 2016, counsel for L'Oréal USA sent a letter to

27  Spatz's counsel, requesting that Spatz provide L'Oréal USA with adequate

28

assurances that Spatz would continue to perform its contractual obligations under the parties' agreements through March 2017.

47.     On that same day, counsel for Spatz informed L'Oréal USA's counsel that Spatz had filed a complaint against "L'Oréal" in this District.  L'Oréal USA was able to view a redacted copy of that Complaint on May 19, 2016. Recognizing in no uncertain terms Spatz would not perform as agreed beyond its termination date of June 30, 2016, this lawsuit followed, to address the breaches and wrongdoing by Spatz.

## **FIRST CLAIM FOR RELIEF**
### **(Breach of Written Logistics Agreement)**

48.     L'Oréal USA realleges and incorporates by reference the allegations contained in Paragraphs 1 through 47 of this Complaint, inclusive, as though fully set forth herein.

49.     On August 16, 2013 and September 10, 2013, Spatz and L'Oréal USA, respectively, executed the Logistics Agreement, pursuant to which L'Oréal USA would provide to Spatz, on a monthly basis and by the eighth business day of the month, a production plan indicating the quantities of each SKU that L'Oréal USA needed Spatz to produce during a "rolling 12-month horizon."

50.     L'Oréal USA pays Spatz for the goods Spatz supplies based on a schedule to which the parties also agree.  The Logistics Agreement establishes performance metrics which include the delivery of quality goods by Spatz at the volume requested by L'Oréal USA, and L'Oréal USA's payment of invoices to Spatz for those goods.

51.     Once L'Oréal USA provides the production plan to Spatz, Spatz would validate the production plan within twenty-four hours if Spatz has no proposed changes, or within forty-eight hours if Spatz has changes to propose.  A copy of L'Oréal USA's validated production plan submitted in March 2016, which

1   identifies the SKUs and quantities to be produced by Spatz for the succeeding 12

2   months, is attached hereto as Exhibit "B."

3          52.     The Logistics Agreement provides that, if L'Oréal USA does

4   not submit a production plan to Spatz by the tenth working day of the month, then

5   Spatz is to use the prior month's production plan, and execute its production

6   obligations for the current month under the prior month's plan.  L'Oréal USA and

7   Spatz have followed this process for several years without incident.

8          53.     On March 30, 2016, L'Oréal USA received an email from Spatz,

9   attaching a letter from Spatz Chairman John Nelson, addressed to L'Oréal S.A.  Mr.

10  Nelson stated in his letter that Spatz was terminating its relationship with L'Oréal

11  S.A., and that Spatz would only supply products through June 30, 2016.

12         54.     On May 17, 2016, L'Oréal USA, through its counsel, demanded

13  that Spatz provide adequate assurances that it would perform its obligations under

14  the March 2016 production plan to provide product to L'Oréal USA through March

15  2017.

16         55.     As of the filing of this Complaint, Spatz has not provided

17  adequate assurances of performance to L'Oréal USA.  Rather, on or about May 16,

18  2016, Spatz filed a procedurally defective Complaint in this District against

19  "L'Oréal" under the Master Agreement.

20         56.     L'Oréal USA has performed all conditions, covenants, and

21  promises required on its part to be performed in accordance with the terms and

22  conditions of the Logistics Agreement and the parties' course of dealing.

23         57.     Spatz breached the Logistics Agreement by refusing to

24  manufacture products for L'Oréal USA beyond June 30, 2016.

25         58.     As a proximate and foreseeable result of Spatz's breach, L'Oréal

26  USA has and will suffer compensatory damages in an amount to be proven at trial,

27  and incidental and consequential damages (including lost profits) in an amount to

28

1   be proven at trial.  Nevertheless, such damages will not redress the irreparable harm

2   caused to L'Oréal USA as alleged herein.

3   ## SECOND CLAIM FOR RELIEF

4   ### (Breach of Sale of Goods Contracts)

5        59.     L'Oréal USA realleges and incorporates by reference the

6   allegations contained in Paragraphs 1 through 58 of this Complaint, inclusive, as

7   though fully set forth herein.

8        60.     On August 16, 2013 and September 10, 2013, Spatz and L'Oréal

9   USA, respectively, executed the Logistics Agreement, pursuant to which L'Oréal

10  USA would provide to Spatz, on a monthly basis and by the eighth business day of

11  the month, a production plan indicating the quantities of each SKU that L'Oréal

12  USA required Spatz to produce during a "rolling 12-month horizon."  Spatz would

13  then validate the production plan within twenty-four hours if Spatz has no proposed

14  changes, or within forty-eight hours if Spatz has changes to propose, if, for

15  instance, Spatz could not fulfill the requirements demanded by L'Oréal USA.

16  L'Oréal USA, as a consumer, pays for the goods it purchases based on a schedule to

17  which the parties also agree.  This arrangement created a requirement or output

18  contract under California Commercial Code Section 2306, which carries with it an

19  obligation by the seller, Spatz, to use its best efforts to supply the goods.

20       61.     The Logistics Agreement provides that, if L'Oréal USA does

21  not submit a production plan to Spatz by the tenth working day of the month, then

22  Spatz is to use the prior month's production plan, and execute its production

23  obligations for the current month under the prior month's plan.

24       62.     Thus, the parties' course of dealing also created a contract under

25  California Commercial Code Sections 1303, 2204 and 2306, whereby Spatz would

26  manufacture all of L'Oréal USA's requirements or, if unable to do so, all the goods

27  that Spatz could in good faith supply to L'Oréal USA.  L'Oréal USA, in turn would

28  timely pay invoices issued by Spatz for those goods.

63.     Pursuant to the parties' agreements and course of dealings, Spatz was required to provide L'Oréal USA with 12 months' notice if it sought to cease manufacturing products for L'Oréal USA.  Spatz recognized this obligation, stating in a March 6, 2016 email that "[w]ith 11 months available, SPATZ believes it is important for it formally announce this to L'Oréal [USA] so L'Oréal [USA] can move as quickly as possible and avoid an out of stock situation."

64.     Yet on March 30, 2016, L'Oréal USA received an email from Spatz, attaching a letter from Spatz Chairman John Nelson, addressed to L'Oréal S.A.  Mr. Nelson stated in his letter that Spatz was terminating its relationship with L'Oréal S.A., and that Spatz would only supply products through June 30, 2016.

65.     Spatz's announcement on March 30, 2016 constitutes an anticipatory repudiation and a breach of the "reasonable notice of termination" provision set forth in California Uniform Commercial Code Section 2309(3).

66.     On May 17, 2016, L'Oréal USA, through its counsel, demanded, pursuant to California Commercial Code Section 2309, that Spatz provide adequate assurances that it would perform its obligations under the production plan submitted by L'Oréal USA in March 2016, which meant that Spatz would continue supplying product to L'Oréal USA through March 2017.

67.     As of the filing of this Complaint, Spatz has not responded to L'Oréal USA's request for adequate assurances.  Rather, on or about May 16, 2016, Spatz filed a procedurally defective Complaint in this District against "L'Oréal" under the Master Agreement.

68.     L'Oréal USA has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Logistics Agreement and the parties' course of dealing.

69.     L'Oréal USA stands ready, willing and able to purchase every contracted-for product that Spatz can produce through March 2017.

70.     As a proximate and foreseeable result of Spatz's breach, L'Oréal USA has and will suffer compensatory damages in an amount to be proven at trial, and incidental and consequential damages (including lost profits) in an amount to be proven at trial.  Nevertheless, such damages will not redress the irreparable harm caused to L'Oréal USA as alleged herein.

## THIRD CLAIM FOR RELIEF

**(Violation of California Business and Professions Code Sections 17200 *et seq*.)**

71.     L'Oréal USA realleges and incorporates by reference the allegations contained in Paragraphs 1 through 70 of this Complaint, inclusive, as though fully set forth herein.

72.     Spatz has reaped huge benefits from its relationship with L'Oréal USA, and has now decided to take advantage of that relationship to the detriment of L'Oréal USA and consumers.  Once Spatz decided to become a direct competitor of L'Oréal USA, it concocted a plan to lure L'Oréal USA into believing that Spatz would continue to supply product to L'Oréal USA, so that it could then abandon L'Oréal USA on short notice, leaving L'Oréal USA with insufficient time to find an alternate supplier.  Spatz's actions harmed its consumer and customer L'Oréal USA in that L'Oréal USA spent increased moneys trying to find alternate sources of supply on a shortened time period.

73.     If Spatz proceeds with its scheme to remove L'Oréal USA as a competitor, it will cause L'Oréal USA to lose valuable shelf space and suffer irreparable harm to its goodwill and reputation, and loss of consumer confidence.

74.     The gravity of Spatz's conduct as alleged above outweighs any justification, motive or reason therefor.  Such misconduct is immoral, unethical, unscrupulous, and offends established public policy.  In addition, such misconduct significantly threatens and harms competition.  Finally, the public is likely to be deceived into believing that the absence of L'Oréal USA products on store shelves

1  is due to a problem with the products or with L'Oréal USA, when, in fact, the harm

2  is caused entirely by Spatz's unfair conduct.

3          75.    As a result, Spatz has engaged in unfair business acts or

4  practices in violation of California Business and Professions Code Sections 17200

5  *et seq.* (the "UCL").

6          76.    Spatz's breach of the Master Agreement, the Logistics

7  Agreement, its failure to comply with the California Commercial Code, including

8  but not limited to Sections 2306 and 2309, and its violation of the United States

9  patent laws, including but not limited to, 35 U.S.C. § 271(a) and and/or 35 U.S.C. §

10  271(g), further constitutes unlawful business acts and practices in violation of the

11  UCL's unlawful prong.  L'Oréal USA is informed and believes that Spatz will

12  continue to engage in these acts unless the Court orders Spatz to cease and desist.

13          77.    Spatz's actions as described herein further violate the UCL's

14  "unfair prong" in that Spatz's actions are immoral, unethical, oppressive or

15  unscrupulous and cause injury to consumers, which outweigh their benefits.

16  Further, this conduct is likely to deceive the public by allowing Spatz to get its own

17  products to market while removing L'Oréal USA's competing product lines.

18          78.    As Spatz has its principal place of business in California, the

19  unfair and unlawful acts described above occurred in California.

20          79.    L'Oréal USA has been injured as a proximate result of Spatz's

21  unfair and unlawful conduct, including incurring attorneys' fees in this action.

22          80.    L'Oréal USA, on behalf of itself and as a representative of the

23  general public, seeks injunctive relief restraining Spatz from improperly

24  terminating its agreements with L'Oréal USA and ordering Spatz to comply with its

25  obligations to L'Oréal USA through March 2017.

26

27

28

**FOURTH CLAIM FOR RELIEF**

**(Fraud — False Promise)**

81.     L'Oréal USA realleges and incorporates by reference the allegations contained in Paragraphs 1 through 80 of this Complaint, inclusive, as though fully set forth herein.

82.     On February 1, 2016, Spatz owners John and Laura Nelson falsely promised during an in-person meeting with representatives of L'Oréal USA, including Severine Thery-Cave, Vice President of Purchasing for L'Oréal USA, that Spatz wished to continue developing its business with L'Oréal USA, and maintaining the parties' existing long-term relationship.   During that meeting, the Nelsons even presented L'Oréal USA with new product innovations, falsely claiming that L'Oréal USA could have exclusivity for these products.

83.     On March 4, 2016, Simon Vieville, L'Oréal USA's Assistant Vice-President of Contract Manufacturing and Severine Thery-Cave held a conference call with Spatz's Chairman, John Nelson, where Mr. Nelson falsely promised L'Oréal USA that Spatz intended to continue working with L'Oréal USA and that it maintained alignment with the Master Agreement with respect to its course of dealings and relationship with L'Oréal USA.

84.     The March 4, 2016 conference call between L'Oréal USA and Spatz was summarized in a March 6, 2016 email sent by Michelle Anderson, a Senior Account Manager for Spatz.  In her email, Ms. Anderson stated that Spatz had studied automation, China sourcing and projected increased costs of doing business in California and it did not see an ability to reduce or offset price increases for the Maybelline Define A Line and Unstoppable product lines for 2017.  Ms. Anderson falsely promised that Spatz would continue to supply these product lines for L'Oréal USA through the end of 2016, stating that "in the spirit of partnership and the desire to be as transparent as possible, Spatz agrees with L'Oréal [USA]'s decision to move this business in 2017, so that L'Oréal [USA] can plan

accordingly."  Ms. Anderson falsely stated that "it is in L'Oréal [USA]'s best interest to accelerate the transfer of these two products by the end of 2016" and that Spatz was providing L'Oréal USA with "11 months" notice as to these two product lines.  Ms. Anderson also falsely promised to meet with L'Oréal USA the week of March 28, 2016 "to finalize alignment on the agreements."

85.     In an email sent by Michelle Anderson of Spatz to Laura Mosley of L'Oréal USA on March 11, 2016, Ms. Anderson falsely promised that Spatz and L'Oréal USA would "work together to prioritize which products to produce."

86.     At the time it made the above promises to L'Oréal USA, Spatz had no intention of supplying the Maybelline Define A Line and Unstoppable products — or any other product lines — to L'Oréal USA through the end of 2016.  Rather, on March 29, 2016, Spatz CEO Mary Beth Siddons revealed to representatives of L'Oréal USA, including Ms. Thery-Cave, that in late January 2016, Spatz had begun an assessment of capacity utilization versus margin contribution for each client and product, including L'Oréal USA products.

87.     Spatz knew that L'Oréal USA would, and that a reasonable person would, believe that, based on its representations, Spatz intended to continue supplying the Maybelline Define A Line and Unstoppable product lines to L'Oréal USA through the end of 2016, and that Spatz would supply all other contracted-for product lines for L'Oréal USA per the parties' arrangement.

88.     Based upon L'Oréal USA's reasonable, actual and justifiable reliance on Spatz's false promises, L'Oréal USA did not know it needed to seek out and did not seek out an alternate supplier for all the products that are covered under the Logistics Agreement.

89.     Spatz's activities described herein were undertaken for the purpose of executing and furthering its scheme to eliminate L'Oréal USA as a competitor and to purposefully, fraudulently, actively and knowingly conceal the nature of the fraud from L'Oréal USA.  Accordingly, L'Oréal USA was not able to

1   discover the true facts relating to the fraud until Spatz abruptly announced it would

2   cease making products for L'Oréal USA on March 30, 2016.  L'Oréal USA's

3   failure to discover Spatz's fraud was due to no fault of L'Oréal USA, as Spatz

4   actively concealed the fraud by consistently representing, orally and in writing, that

5   it was aligned with L'Oréal USA and intended to continue its business relationship

6   under the parties' agreements and course of dealing.

7        90.    As a proximate and foreseeable result of Spatz's false promises,

8   L'Oréal USA has suffered damages in an amount to be proven at trial.

9        91.    In making the false promises alleged above, Spatz has engaged

10  in malice, oppression, and/or fraud with the intent to deprive L'Oréal USA of its

11  rights and property.  As such, L'Oréal USA is entitled to recover, and Spatz is

12  liable for, punitive damages as a result of Spatz's conduct, pursuant to California

13  Civil Code Section 3294.

14                      **FIFTH CLAIM FOR RELIEF**

15                  **(Fraud – Affirmative Misrepresentation)**

16       92.    L'Oréal USA realleges and incorporates by reference the

17  allegations contained in Paragraphs 1 through 91 of this Complaint, inclusive, as

18  though fully set forth herein.

19       93.    On February 1, 2016, Spatz owners John and Laura Nelson

20  falsely promised during an in-person meeting with representatives of L'Oréal USA,

21  including Severine Thery-Cave, Vice President of Purchasing for L'Oréal USA,

22  that Spatz wished to continue developing its business with L'Oréal USA.  During

23  that meeting, the Nelsons even presented L'Oréal USA with new product

24  innovations, falsely claiming that L'Oréal USA could have exclusivity for these

25  products.

26       94.    On March 4, 2016, Simon Vieville, L'Oréal USA's Assistant

27  Vice-President of Contract Manufacturing and Severine Thery-Cave held a

28  conference call with Spatz's Chairman, John Nelson, where Mr. Nelson falsely

promised L'Oréal USA that Spatz would continue working with L'Oréal USA.  In furtherance of this false promise, John Nelson, on behalf of Spatz, made the following misrepresentations, which were memorialized in an email sent by Michelle Anderson of Spatz on March 6, 2016:

    (a)    Falsely representing that Spatz "maintains alignment" on the Master Agreement with L'Oréal USA;

    (b)    Falsely representing that Spatz believed L'Oréal USA should accelerate the transfer of the Maybelline Define A Line and Maybelline Unstoppable product lines to another supplier "by the end of 2016";

    (c)    Falsely representing that Spatz would be providing L'Oréal USA with 11 months' notice of termination as to the Maybelline Define A Line and Maybelline Unstoppable product lines; and

    (d)    Falsely representing that Spatz intended to meet with L'Oréal USA the week of March 28, 2016 "to finalize alignment on the agreements."

95.    In an email sent by Michelle Anderson of Spatz to Laura Mosley of L'Oréal USA on March 11, 2016, Ms. Anderson misrepresented that Spatz intended to work together with L'Oréal USA "to prioritize which products to produce."

96.    The misrepresentations referred to in paragraphs 93 through 95 were made orally and in writing, on behalf of Spatz, to defraud L'Oréal USA into believing that Spatz intended to continue supplying products to L'Oréal USA at least through 2016.

97.    Spatz knew that the above representations were false and misleading, and it made the false representations with the intent to fraudulently lure L'Oréal USA into a false sense of security so that L'Oréal USA would be unable to

1  locate another supplier once Spatz ceased making products on June 30, 2016.  On

2  March 29, 2016, Spatz CEO Mary Beth Siddons revealed to representatives of

3  L'Oréal USA, including Ms. Thery-Cave, that in late January 2016, Spatz had

4  begun an assessment of its capacity utilization versus margin contribution for each

5  client and product, including L'Oréal USA products, but Spatz never informed

6  L'Oréal USA of these actions.

7       98.    Spatz either knew or recklessly disregarded the following:  (1)

8  that the misrepresentations described above were material; (2) and that if the true

9  facts were disclosed, L'Oréal USA would have searched for alternate suppliers for

10  all of its products much sooner so it could avoid an out of stock situation.

11       99.    Based upon L'Oréal USA's reasonable, actual and justifiable

12  reliance on the material misrepresentations and nondisclosures alleged above,

13  L'Oréal USA did not locate alternate suppliers for the products manufactured by

14  Spatz, which Spatz announced it would cease manufacturing on June 30, 2016.

15       100.   Spatz's activities described herein were undertaken for the

16  purpose of executing and furthering its scheme to eliminate L'Oréal USA as a

17  competitor and to purposefully, fraudulently, actively and knowingly conceal the

18  nature of the fraud from L'Oréal USA.  Accordingly, L'Oréal USA was not able to

19  discover the true facts relating to the fraud until Spatz abruptly announced it would

20  cease making products for L'Oréal USA on March 30, 2016.  L'Oréal USA's

21  failure to discover Spatz's fraud was due to no fault of L'Oréal USA, as Spatz

22  actively concealed the fraud by consistently representing, orally and in writing, that

23  it was aligned with L'Oréal USA and intended to continue its business relationship

24  under the parties' agreements and course of dealing.

25       101.   As a proximate and foreseeable result of Spatz's foregoing

26  misrepresentations and omissions of material fact, L'Oréal USA has suffered

27  damages in an amount to be proven at trial.

28

1        102.   In making the material misrepresentations and concealing the

2   material facts alleged above, Spatz engaged in malice, oppression, and/or fraud

3   with the intent to deprive L'Oréal USA of its rights and property.  As such, L'Oréal

4   USA is entitled to recover and Spatz is liable for punitive damages as a result of

5   Spatz's conduct, pursuant to California Civil Code Section 3294.

6                        **SIXTH CLAIM FOR RELIEF**

7                    **(Negligent Misrepresentation)**

8        103.   L'Oréal USA realleges and incorporates by reference the

9   allegations contained in Paragraphs 1 through 102 of this Complaint, inclusive, as

10   though fully set forth herein.

11        104.   Spatz had a duty, including, but not limited to, a contractual

12   duty, to disclose all material facts about its capacity and its intent to manufacture

13   products for L'Oréal USA to L'Oréal USA, and to ensure that Spatz's

14   representations and promises regarding its ability and intent to manufacture

15   products for L'Oréal USA were accurate.

16        105.   Spatz negligently made the false representations and failed to

17   disclose the material facts identified in paragraphs 82-85 and 93-95, above.

18        106.   If the true facts were disclosed, L'Oréal USA would have

19   searched for alternate suppliers for all of its products much sooner so it could avoid

20   an out of stock situation.

21        107.   Instead, based upon reasonable, actual and justifiable reliance on

22   the material misrepresentations and material nondisclosures alleged above, L'Oréal

23   USA did not locate alternate suppliers for the products manufactured by Spatz,

24   which Spatz announced it would cease manufacturing on June 30, 2016.

25        108.   As a proximate and foreseeable result of Spatz's foregoing

26   misrepresentations and omissions of material fact, L'Oréal USA has suffered

27   damages in an amount to be proven at trial.

28

CASE NO. 2:16-cv-03572                                          COMPLAINT

## SEVENTH CLAIM FOR RELIEF

### (Breach of Written Full Buy Master Agreement

### for Subcontracting Manufacturing (as Third-Party Beneficiary thereof))

109. L'Oréal USA realleges and incorporates by reference the allegations contained in Paragraphs 1 through 108 of this Complaint, inclusive, as though fully set forth herein.

110. On November 15, 2013 and July 1, 2014, Spatz and L'Oréal S.A., respectively, entered into the Master Agreement, whereby Spatz, as the "Supplier" and L'Oréal S.A., as the "Purchaser," agreed that Spatz would manufacture and furnish products ready for use by L'Oréal S.A. and its subsidiaries. L'Oréal S.A.'s subsidiaries are defined in the Master Agreement as "Customer Subsidiaries."

111. Spatz has supplied products to L'Oréal USA, as a Customer Subsidiary, pursuant to the Master Agreement over the course of several years. L'Oréal USA is thus a third-party beneficiary under the Master Agreement. Pursuant to Section 1559 of the California Civil Code, an agreement made expressly for the benefit of a third party may be enforced by that third party at any time before the parties to the agreement rescind it.

112. Pursuant to the Master Agreement, L'Oréal S.A. and the Customer Subsidiaries would provide Spatz with their plans for Spatz's manufacture of their products.

113. Article 3.2 of the Master Agreement prohibits Spatz from manufacturing or delivering any products bearing L'Oréal S.A. trademarks or logos to anyone other than L'Oréal S.A. or the Customer Subsidiaries.

114. Article 12.1 of the Master Agreement provides that L'Oréal S.A. or the Customer Subsidiaries shall pay Spatz a product price that has been agreed upon by the parties.

24

115.   Pursuant to Article 12.2 of the Master Agreement, Spatz agreed to communicate any change of pricing for the products it was manufacturing through a pricing schedule, and that the change in price would only be applied after having been validated by L'Oréal S.A. or the Customer Subsidiaries.

116.   Article 12.3 of the Master Agreement provides that all purchase orders for the products are to be issued by each Customer Subsidiary to Spatz, and that Spatz shall invoice each Customer Subsidiary directly.

117.   The Master Agreement was one of unlimited duration.  Article 14 of the Master Agreement provides that each party may nevertheless terminate the Agreement by giving three months' prior notice to the other party, sent by registered letter, return receipt requested.

118.   Article 19 of the Master Agreement provides that it is subject to the laws of the country of the Purchaser, which is France.

119.   On March 30, 2016, John Nelson, Chairman of Spatz, sent a letter to Regine Lucas, Chief Purchasing Officer for L'Oréal S.A., informing L'Oréal S.A. that "SPATZ Laboratories is hereby terminating its relationship with L'Oréal pursuant to Article 14" of the Master Agreement.  In its correspondence, Spatz indicated that it would only supply product through June 30, 2016.

120.   Spatz breached the Master Agreement by providing only three months' notice of termination.  Pursuant to Article L. 442-6, I, 5 of the French Commercial Code, a party seeking to terminate an established business relationship must provide written notice that takes into account the duration of the parties' commercial relationship.  Article L. 442-6, I, 5 is a mandatory provision, and applies regardless of the existence of any contractual notice period.

121.   L'Oréal USA has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Master Agreement.

122.   As a proximate and foreseeable result of Spatz's breach of the Master Agreement, L'Oréal USA has suffered damages in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 8,025,869)

123.   L'Oréal USA realleges and incorporates by reference the allegations contained in Paragraphs 1 through 122 of this Complaint, inclusive, as though fully set forth herein.

124.   On September 27, 2011, the '869 patent, entitled "Cosmetic compositions having enhanced wear properties," was duly and legally issued to L'Oréal S.A. by the United States Patent and Trademark Office.  A true and correct copy of the '869 patent is attached hereto as Exhibit "C."

125.   Since the issuance of the '869 patent, L'Oréal S.A. has been and still is the owner of the '869 patent.  L'Oréal USA is the exclusive licensee of the '869 patent, having all substantial rights in and to the '869 patent, with the rights to bring enforcement actions for past, present and future infringement and to collect damages for such infringement.

126.   The '869 patent discloses and claims a cosmetic composition comprising at least one polypropylsilsesquioxane film forming resin; at least one volatile solvent; and optionally, at least one colorant. The cosmetic composition is anhydrous and is free from any non-volatile solvent or plasticizer. The composition can provide the basis of a lipstick, foundation or mascara.

127.   Spatz has made, used, offered to sell and/or sold cosmetics products in the United States, including lip products marketed under the trade names "Kylie Matte Liquid Lipstick" and "ColourPop Cosmetics Ultra Matte Lip" (collectively, "the Accused Products.")

128.   Upon information and belief, the labeling of the Accused Products indicates that the Accused Products contain each of the ingredients

1    specified by the claims of the '869 patent.  Upon information and belief, copies of

2    the ingredient labeling of representative samples of the Accused Products are

3    attached hereto as Exhibits "D" and "E."

4          129.   Upon information and belief, Spatz has been and still is directly

5    infringing at least one claim of the '869 patent under 35 U.S.C. § 271(a) and/or 35

6    U.S.C. § 271(g) by making, using, offering to sell and/or selling the Accused

7    Products in the United States in violation of L'Oréal USA's patent rights and will

8    continue to do so unless enjoined by this Court.

9          130.   On information and belief, the Kylie Matte Liquid Lipstick (the

10   "Kylie Product") infringes at least Claims 1 and 8 of the '869 patent because its

11   formula includes polypropylsesquioxane, Isododecane, which is a volatile solvent,

12   and more specifically a volatile hydrocarbon-based oil, and uses a multitude of

13   colorants in the formulation as listed in Exhibit "D."  In addition, the Kylie Product

14   is free from both platicizers and non-volatile solvents.

15         131.   On information and belief, the Kylie Product infringes Claim 8

16   of the '869 patent because the product is a liquid lipstick.

17         132.   On information and belief, the ColourPop Cosmetics Ultra

18   Matte Lip (the "ColourPop Product") infringes at least Claims 1 and 8 of the '869

19   patent because its formula includes polypropylsisesquioxane, Isododecane, which is

20   a volatile solvent, and more specifically a volatile hydrocarbon-based oil, and uses

21   a multitude of colorants in the formulation as listed in Exhibit "E."  On information

22   and belief, the ColourPop Product is free from both platicizers and non-volatile

23   solvents.

24         133.   On information and belief, the ColourPop product infringes

25   Claim 8 of the '869 patent because the product is a liquid lipstick.

26         134.   As early as at least the letter of May 17, 2016, Spatz has been on

27   notice of its infringement of the '869 patent and thus its infringement of the '869

28   patent has been and will continue to be willful and deliberate.

CASE NO. 2:16-cv-03572                                                          COMPLAINT

135.   Spatz's infringement of the '869 patent has caused and will continue to cause L'Oréal USA substantial and irreparable injury, for which L'Oréal USA is entitled to all of the relief provided by 35 U.S.C. §§281, 283, 284 and 285, including but not limited to injunctive relief, compensatory damages not less than the amount of a reasonable royalty, interest, cost, enhanced damages, and reasonable attorney's fees, as the court deems just and appropriate.

### NINTH CLAIM FOR RELIEF

### (Specific Performance and Injunctive Relief)

136.   L'Oréal USA realleges and incorporates by reference the allegations contained in Paragraphs 1 through 135 of this Complaint, inclusive, as though fully set forth herein.

137.   At the time L'Oréal USA and Spatz entered into the Logistics Agreement, the consideration L'Oréal USA was to pay under the agreement was adequate and the agreement is just and reasonable as to Spatz.

138.   L'Oréal USA has offered to pay the full consideration called for in the Logistics Agreement and continues to be ready, willing, and able to purchase every contracted-for product that Spatz can produce through March 2017.

139.   L'Oréal USA has demanded that Spatz continue to manufacture products for L'Oréal USA pursuant to the production plan submitted by L'Oréal USA in March 2016.

140.   Spatz has refused and continues to refuse to manufacture products for L'Oréal USA beyond June 30, 2016, as required by the Logistics Agreement and the parties' course of dealing.  Even if L'Oréal USA had not provided a production plan to Spatz in March 2016, per the Logistics Agreement, Spatz still would be required to produce products for L'Oréal USA through February 2017, pursuant to the production plan submitted by L'Oréal USA in February 2016.

141.   Spatz has acknowledged that L'Oréal USA cannot obtain a new supplier for its products on short notice and that, to avoid an out of stock situation for just two of the product lines manufactured by Spatz, L'Oréal USA would need at least 11 months' notice of termination:  "With 11 months available, SPATZ believes it is important for it formally announce this to L'Oréal [USA] so L'Oréal [USA] can move as quickly as possible and avoid an out of stock situation."

142.   With L'Oréal USA facing an out of stock situation that will cause irreparable injury to its reputation and goodwill in the form of lost shelf space and loss of customer confidence, which it may never be able to regain—separate and apart from its provable financial losses—L'Oréal USA has no adequate remedy at law to enforce the provisions of the Logistics Agreement and the parties' course of dealing and specific enforcement should follow.

143.   L'Oréal USA is entitled to specific performance of the terms, conditions, and provisions of the Logistics Agreement by court decree, among other things, ordering Spatz to manufacture and supply products to L'Oréal USA through March 2017, as outlined in the production plan submitted by L'Oréal USA to Spatz in March 2016, pursuant to the terms of the Logistics Agreement and as reflected through the parties' course of dealing.

## TENTH CLAIM FOR RELIEF

### (Declaratory Relief)

144.   L'Oréal USA realleges and incorporates by reference the allegations contained in Paragraphs 1 through 143 of this Complaint, inclusive, as though fully set forth herein.

145.   An actual controversy has now arisen and now exists between L'Oréal USA and Spatz as to their respective rights and obligations under the Master Agreement the Logistics Agreement and the parties' course of dealing.  In particular:

1                  (a)     L'Oréal USA contends that it is a third party beneficiary of the Master Agreement and that, under French Law, which governs the Master Agreement, Spatz must provide at least 18 months' notice of termination to L'Oréal USA before it can cease manufacturing products for L'Oréal USA.

(b)     L'Oréal USA further contends that under the Logistics Agreement and course of dealing between the parties, Spatz must provide no less than 12 months' notice before it can cease making products for L'Oréal USA.

(c)     Spatz has taken the position that it need only provide three months' notice to terminate its relationship with L'Oréal USA.

146.   This Court may enter a binding declaration of the rights and liabilities of the parties under the Master Agreement and Logistics Agreement. Such a declaration would terminate the controversy.

147.   An actual controversy has now arisen and now exists between L'Oréal USA and Spatz as to their respective rights and obligations under the '869 patent. L'Oréal USA contends that Spatz is willfully and deliberately infringing the '869 patent. Upon information and belief, Spatz disputes that its products infringe the '869 patent.

148.   This Court may enter a binding declaration of the rights and liabilities of the parties under the '869 patent. Such a declaration would terminate the controversy.

149.   L'Oréal USA thus prays that the Court enter a declaration in favor of L'Oréal USA and against Spatz declaring that Spatz is required to perform its obligations under the Master Agreement and Logistics Agreement for at least 12 months, and that Spatz is infringing the '869 patent.

## **PRAYER FOR RELIEF**

**WHEREFORE**, L'Oréal USA respectfully requests this Court enter judgment against L'Oréal USA granting relief as follows:

### **On The First Claim For Relief:**

1.  For compensatory damages according to proof, including interest; and

2.  For incidental and consequential damages, according to proof.

3.  For injunctive relief restraining Spatz from improperly terminating its agreements with L'Oréal USA and ordering Spatz to comply with its obligations to L'Oréal USA through March 2017.

### **On The Second Claim For Relief:**

4.  For compensatory damages according to proof, including interest; and

5.  For incidental and consequential damages, according to proof.

6.  For injunctive relief restraining Spatz from improperly terminating its agreements with L'Oréal USA and ordering Spatz to comply with its obligations to L'Oréal USA through March 2017.

### **On The Third Claim For Relief:**

7.  For injunctive relief restraining Spatz from improperly terminating its agreements with L'Oréal USA and ordering Spatz to comply with its obligations to L'Oréal USA through March 2017.

### **On The Fourth Claim For Relief:**

8.  For damages according to proof, including interest; and

9.  For punitive and exemplary damages.

### **On The Fifth Claim For Relief:**

10. For damages according to proof, including interest; and

11. For punitive and exemplary damages.

CASE NO. 2:16-cv-03572                                          COMPLAINT

1                              **On The Sixth Claim For Relief:**

2           12.   For damages according to proof, including interest.

3   .                   **On the Seventh Claim For Relief:**

4           13.   For compensatory damages according to proof, including

5   interest; and

6           14.   For incidental and consequential damages, according to proof.

7                       **On the Eighth Claim For Relief:**

8           15.   For a judgment that Spatz has infringed one or more claims of

9   the '869 patent;

10           16.   For an order and judgment preliminarily and permanently

11   enjoining Spatz and its officers, directors, agents, servants, employees, affiliates,

12   attorneys, and all others acting in privity or in concert with them, and their

13   investors, partners, parents, subsidiaries, divisions, successors, and assigns, from

14   further acts of infringement of the '869 patent;

15           17.   For a judgment awarding L'Oréal USA all damages adequate to

16   compensate for Spatz's infringement of the '869 patent, and in no event less than a

17   reasonable royalty for Spatz's acts of infringement, including all pre-judgment and

18   post-judgment interest at the maximum rate permitted by law;

19           18.   For a judgment declaring that Spatz's infringement of the '869

20   patent has been willful and deliberate;

21           19.   For a judgment awarding L'Oréal USA all damages, including

22   treble damages, as a result of Spatz's willful and deliberate infringement of the '869

23   patent, pursuant to 35 U.S.C. § 284, together with pre-judgment and post-judgment

24   interest; and

25           20.   For a judgment declaring that this case is exceptional and

26   awarding L'Oréal USA its expenses, costs, and attorney's fees in accordance with

27   35 U.S.C. §§ 284 and 285 and Rule 54(d) of the Federal Rules of Civil Procedure.

28

1          **On the Ninth Claim For Relief:**

2         21.    For specific performance preventing Spatz from terminating its

3  relationship with L'Oréal USA on three months' notice and therefore compelling

4  delivery of products to L'Oréal USA through March 2017; and

5         22.    For incidental and consequential damages, according to proof.

6          **On the Tenth Claim For Relief:**

7         23.    For a Declaration of Rights declaring that Defendant Spatz is

8  required to perform its obligations under the Master Agreement and the Logistics

9  Agreement through March 2017 and that Defendant Spatz has willfully and

10  deliberately infringed the '869 patent.

11           **ON ALL CLAIMS FOR RELIEF**

12         24.    For attorneys' fees and costs expended in the prosecution of this

13  action to the full extent permitted by law;

14         25.    For damages according to proof at trial; and

15         26.    For such other and further relief as this Court finds just and

16  proper.

17

18  DATED:  May 23, 2016      DENNIS S. ELLIS
                      KATHERINE F. MURRAY

19                        SEAN D. UNGER
                      PAUL HASTINGS LLP

20

21                        By:_____/s/ Dennis S. Ellis_____

22                                 Dennis S. Ellis

23                        Attorneys for Plaintiff

24                        L'ORÉAL USA, INC.

25

26

27

28

# **DEMAND FOR JURY TRIAL**

L'Oréal USA hereby demands a trial by jury of all issues so triable pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1 of the Central District of California.

DATED:  May 23, 2016          DENNIS S. ELLIS
                               KATHERINE F. MURRAY
                               SEAN D. UNGER
                               PAUL HASTINGS LLP


                               By:_____/s/ Dennis S. Ellis_____
                                              Dennis S. Ellis

                               Attorneys for Plaintiff
                               L'ORÉAL USA, INC.

CASE NO. 2:16-cv-03572                                          COMPLAINT